# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DEBORAH A. ALESIA,      )
                                  )

     **Plaintiff,**           )
                                  )

     **v.**                           )         **Case No. 10 C 3992**
                                  )

**MICHAEL J. ASTRUE,**      )         **Magistrate Judge Morton Denlow**
**Commissioner of Social Security,**    )
                                  )

     **Defendant.**         )

## MEMORANDUM OPINION AND ORDER

Claimant Deborah A. Alesia ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Defendant" or "Commissioner") denying Claimant's application for Disability Insurance Benefits ("DIB"). In support of her motion for summary judgment, Claimant raises the following issues: (1) whether the administrative law judge properly weighed the medical evidence when finding that Claimant's depression was non-severe; (2) whether the ALJ adequately considered whether Claimant's combined impairments medically equal a listed impairment; (3) whether the ALJ properly determined Claimant's residual functional capacity; and (4) whether the ALJ validly found Claimant could perform her past relevant work. In response, Defendant has filed a cross-motion for summary judgment requesting that the Court affirm the Commissioner's decision. For the following reasons, the Court grants Claimant's motion for summary judgment, denies the Defendant's cross-motion for summary judgment and remands the case to the Commissioner for further proceedings consistent with this opinion.

# I. BACKGROUND FACTS

## A.    Procedural History

Claimant initially applied for DIB on December 4, 2006, alleging a disability onset date of November 3, 2006.  R. 133–39.  The Social Security Administration ("SSA") denied her application on April 27, 2007.  R. 64–68.  Claimant then filed a request for reconsideration, which the SSA denied on September 4, 2007.  R. 69–72.  Shortly thereafter, Claimant requested a hearing before an Administrative Law Judge.  R 73–74.

On July 14, 2009, Administrative Law Judge Joel G. Fina (the "ALJ") presided over a hearing at which Claimant appeared with her attorney, Barbara Rodecki.  R. 27–61.  Claimant and Thomas Gresik, a vocational expert, testified at the hearing.  On September 2, 2009, the ALJ rendered a decision finding Claimant not disabled under the Social Security Act.  R. 11–26.  Specifically, the ALJ found Claimant has the residual functional capacity to perform sedentary work and can perform her past relevant work as a claims auditor or claims examiner.  R. 19–23.

Claimant then requested review of the ALJ's decision by the Appeals Council.  R. 10.  The Appeals Council denied Claimant's request on April 28, 2010.  R. 1–3.  Therefore, the ALJ's decision became the final decision of the Commissioner.  Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

**B.     Hearing Testimony — July 14, 2009**

**1.     Deborah Alesia — Claimant**

At the time of the hearing, Claimant was fifty-one years old, married, and living with her husband and her brother, who moved in six months before the hearing to "give [Claimant] a hand." R. 33–34, 42. She attended approximately two years of college and her past work includes over twenty years of experience as a claims adjudicator and internal auditor for Blue Cross and Blue Shield. R. 34–35. Claimant's financial disclosures reveal that her earnings peaked at nearly $60,000 in 2004. R. 153. In October 2006, however, Claimant quit her job with Blue Cross "because [she] could no longer get to work or function at [her] job." R. 34. She made attempts to obtain other work-from-home employment opportunities, but was unable to do so. R. 35, 45–46.

During the hearing, Claimant described the extent of her physical limitations caused mainly by her fibromyalgia.[1] She has trouble keeping her balance and frequently falls or bumps into things. R. 43. She can only stand for five minutes before she needs to sit. R. 37. Even when sitting down, Claimant needs to shift positions because she gets stiff sitting in one position. R. 38, 51. She lies down eighty-five to ninety percent of the day. R. 51. Because of her difficulty with stairs, Claimant sometimes sleeps on a couch rather than her second-story bedroom. R. 39–41. Additionally, she has difficulty reaching more than a foot in front

---

[1] Fibromyalgia is "a chronic disorder characterized by widespread pain, tenderness, and stiffness of muscles and associated connective tissues structures that is typically accompanied by fatigue, headache, and sleep disturbances." Merriam-Webster's Medical Dictionary (2007), *available at* http://dictionary.reference.com/browse/fibromyalgia.

of her and can only lift a few pounds.  R. 43, 46–47 .  She requires assistance caring for personal needs including showering and getting dressed.  R. 35–36, 43, 47.  She also requires assistance with most household chores; the only household chore she performs is dusting.  R. 37–38.  She has problems driving safely because she has difficulty moving her arms or turning her head.  R. 36.

Claimant also explained the extent of her medical treatments.  The Fibromyalgia Treatment Centers of America treated her with drugs, antidepressants, painkillers, physical therapy, and trigger point injections.  R. 50.  Additionally, she received injections into the herniated disks in her lower spine.  R. 48.  Despite on-going treatment, nothing provided her with lasting relief, and although some days are better than others, for the most part she is never without pain.  R. 44, 50–51.  After quitting her job in 2006, Claimant purchased COBRA health insurance for about six months, but could no longer afford it once her husband lost his job.  R. 45.  Currently, she is uninsured and cannot afford injections or fibromyalgia medications.  R. 44–45, 48.  The only medications Claimant now takes are Armor Thyroid for hypothyroidism and Premarin for a hysterectomy she had ten years ago, which cost $4 each per month.  R. 44–45.  When asked if she had any mental impairments, Claimant testified that she did not.  R. 48.

### 2. Thomas Gresik — Vocational Expert

Thomas Gresik testified as the vocational expert ("VE").  R. 53.  The VE stated that Claimant's prior positions as a claims auditor and a claims examiner are sedentary skilled work.  *Id.*  The ALJ then posited a hypothetical person with Claimant's age, education, and

work experience. Among other things, the hypothetical person could participate in light work and frequently balance. R. 53–54. The VE testified that such a person could perform Claimant's past relevant work. R. 54. The ALJ then modified the hypothetical by reducing the exertional level from light to sedentary work, and then modified it again to sedentary work with the option to sit or stand at will. R. 54–55. In response to both modifications, the VE testified that the hypothetical person could perform Claimant's past relevant work. *Id.* Next, the ALJ added a restriction to simple, routine, and repetitive tasks. R. 55. The VE testified that this person could not perform Claimant's past work but that if the person were under age fifty, the individual could obtain other positions that exist in the regional and national economy. R. 55–56.

Finally, the ALJ hypothesized a person who, due to a combination of medical conditions and associated pain, cannot engage in sustained work activity on a regular and continuing basis for eight hours a day, five days a week, for a forty-hour work week. R. 56. The VE replied that this person would be precluded from full-time competitive work regardless of exertional level. R. 56. Employers customarily provide employees up to two fifteen-minute rest periods and one thirty-minute lunch break during an eight-hour work day. R. 56–57. They normally allow a worker to be absent one-half day per month, or six days per year in non-collective bargaining positions, and one day per month, or twelve days per year for collective bargaining positions. R. 57. If an employee exceeds these allotted absences on a regular basis, she can no longer secure competitive employment. *Id.* Finally, the VE stated that employers do not allow employees to lay down at work, regardless of

exertional level.  R. 58.

## C.    Medical Evidence

### 1.    Fibromyalgia Treatment Centers of America

Even before the alleged onset date in November 2006, Claimant was treated for fibromyalgia at the Fibromyalgia Treatment Centers of America from September 2003 until July of 2006.  R. 415–585.  During that time, she attended regular check-up appointments, participated in controlled exercises and trigger point therapy, and received various medications as part of treatment for her ongoing symptoms.  In April 2005, Claimant's doctor, Dr. Michael McNett, requested that Claimant work from home at least three days per week.  R. 282–83.  In June and July 2005, her progress notes indicated her pain and depression getting worse.  R. 427–30, 433–36.  By September 2005, however, Claimant indicated her tremors were less frequent and depression was greatly reduced.  R. 423–24. In February 2006, Claimant reported feeling better.  R. 292.  In a July 12, 2006 letter to Dr. Patel of WellGroup Health, Dr. McNett, reported Claimant to have a Zung Depression Score of 0.39, a normal rating, and a mild to moderate fibromyalgia questionnaire score of a 39. R. 289–90.

## 2. Dr. Daniel J. Grzegorek, M.D. and Dr. Sunil A. Patel, M.D.—WellGroup Health

In combination with her treatment from Fibromyalgia Treatment Centers of America, from January 2003 until November 2006, Claimant also received medical care from Dr. Daniel Grzegorek and Dr. Sunil Patel. R. 598–609. During that time, Claimant received examinations and treatment for numerous medical conditions including fatigue, irritable bowel syndrome, chronic depression, Herpes simplex, fibromyalgia, Gastro Esophageal Reflux Disease, allergies, and hypoglycemia. R. 601–09.

## 3. Dr. John Hong, M.D.—Treating Physician

In September 2006, just before the alleged onset date, Claimant began seeing Dr. John Hong to treat her fibromyalgia. R. 618. At that time, Claimant received trigger point injections and was advised to begin physical therapy three times per week. *Id.* As of October 2010, Dr. Hong noted that Claimant had delayed starting physical therapy because she had attempted to start a new business. R. 615. In addition to trigger point injections, Claimant also began practicing yoga and seeing a chiropractor for spinal adjustments. R. 614. Claimant continued to see Dr. Hong monthly to receive trigger point injections. *Id.* Dr. Hong's progress notes from December 7, 2006 noted that Claimant was "much improved." *Id.* Dr. Hong's evaluation of Claimant remained consistent throughout January and February of 2007, including notes that Claimant experienced significant relief for almost two weeks following trigger point injections. R. 620–622.

On April 2, 2007 Dr. Hong wrote a letter to the Bureau of Disability Determination Services. R. 610–11. He reported that Claimant had a long history of fibromyalgia characterized by "diffuse pain, numerous trigger points, as well as lumbar and cervical pain." R. 610. Dr. Hong explained that Claimant's pain levels were being controlled in conjunction with medication prescribed by Claimant's psychiatrist. *Id.* At the same time, Dr. Hong noted that prolonged, rigorous physical activity, as well as general fatigue and stress, may aggravate her condition. R. 610–611. He concluded that Claimant had no mental impairments or impairments related to sitting, standing, or walking. R. 611.

### 4. Dr. Joseph Beck—Treating Psychiatrist

Claimant also saw a treating psychiatrist, Dr. Joseph Beck, from September 27, 2006 until December 6, 2006. R. 623. In April 2007, Dr Beck sent a psychiatric report to the Illinois Bureau of Disability Determination Services, in which he reported seeing Claimant every two months. R. 623. According to the report, Claimant suffered from dysphoria, anhedonia, lethargy, and generalized fatigue. *Id.* Dr. Beck diagnosed Claimant with major depressive disorder and fibromyalgia, and prescribed her multiple medications for treatment including Effexor, Seroquel, and Mirapex. R. 626. He explained that Claimant would still be able to perform work-related activities, but indicated that she would need an "extremely variable workload to compensate for her intermittent symptoms." *Id.*

On July 12, 2007, Dr. Beck completed another mental impairment questionnaire. He reported that Claimant had recurrent major depressive disorder of moderate severity. R. 641–644. Claimant's symptoms included those reported in the previous form, plus hostility,

difficulty concentrating, and persistent anxiety. R. 641. Dr. Beck assessed Claimant to have a Global Assessment of Functioning (GAF) score of 60, with her highest GAF in the past year being 70.[2] He concluded that Claimant had moderate restrictions in activities of daily living; moderate difficulties maintaining social functioning; frequent difficulties maintaining concentration, persistence, or pace; and repeated episodes of decompensation. R. 641, 644. Dr. Beck also concluded that Claimant's condition would cause her to be absent from work more than three times per month. R. 642. He opined that Claimant's condition would seriously limit her mental ability to perform unskilled work, and asserted that Claimant had little or no ability to maintain regular attendance and punctuality. R. 643. Dr. Beck did not provide a narrative explanation for any of these conclusions, R. 644, and the record does not contain treatment notes from Dr. Beck.

### 5. Dr. Tyrone Hollerauer—Reviewing Psychologist

On April 25, 2007, Dr. Tyrone Hollerauer reviewed Claimant's mental health records on behalf of the SSA. R. 627–40. These records included Dr. Beck's first report, but not his second. R. 639. Dr. Hollerauer determined that Claimant's depression was non-severe. R.

---

[2]The GAF is a scale of zero through 100 used by medical health professionals to rate social, occupational, and psychological functioning of adults. *Diagnostic & Statistical Manual of Mental Disorders Text Revision* 34 (4th ed. 2000).

A GAF score from 61 to 70 means patient has "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

A GAF score from 51 to 60 means "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

627, 630. He concluded that Claimant had only mild restrictions in activities of daily living; mild difficulties maintaining social functioning; mild difficulties maintaining concentration, persistence, or pace; and no extended episodes of decompensation. R. 637. Reviewing physician Dr. Terry Travis affirmed Dr. Hollerauer's conclusions. R. 645–47.

### 6. Dr. Young-Ja Kim, M.D.—Reviewing Physician

On April 26, 2007, Dr. Young-Ja Kim, another non-examining reviewer, evaluated Claimant's medical records on behalf of the SSA. R. 648–55. Dr. Kim determined that Claimant could lift twenty pounds occasionally and ten pounds frequently and could stand, sit, and walk for up to six hours in an eight-hour work day. R. 649. In addition, Dr. Kim determined Claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. R. 650. Reviewing physician Dr. Terry Travis affirmed Dr. Kim's conclusions. R. 645–47.

### 7. Miscellaneous Treatment From September 2007 to April 2009

On September 27, 2007, Claimant received an MRI of her lumbar spine. R. 658–59. The test results revealed that Claimant had mild degenerative changes in her spine. *Id.* In August 2008, Claimant saw Dr. George Geotsalitis who prescribed her Premarin for hormone deficiency depression and Armour Thyro for hypothyroidism. R. 666. Aside from these medications, Claimant has not received any medical treatment since 2007. R. 665.

**D.     The ALJ's Decision—September 2, 2009**

After a hearing and review of the medical evidence, the ALJ determined Claimant had the residual functional capacity ("RFC")[3] to perform past relevant work and therefore denied her application for DIB.  R. 11–26.  The ALJ evaluated Claimant's application under the required five-step sequential analysis.  At step one, he determined Claimant had not engaged in substantial gainful activity since November 3, 2006.  R. 16.  At step two, the ALJ found that Claimant had the severe impairments of fibromyalgia, degenerative disc disease, and hypothyroidism.  *Id.*  The ALJ proceeded to consider whether Claimant's depression was medically severe.  In doing so, he weighed both Dr. Beck's April 2007 evaluation and the reviewing physicians' opinions in assessing its effects on Claimant's daily living; social functioning; concentration, persistence or pace; and episodes of decompensation.  R. 17–18.  The ALJ found mild limitation in the first three areas, with no episodes of decompensation, and therefore concluded that Claimant's depression was not severe.  *Id.*  He gave no weight to Dr. Beck's July 2007 examination because of its lack of explanation and absence of supporting evidence in the record.  R. 18.

At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that meets or medically equals a listed impairment.  R. 19.  The ALJ considered disorders of the spine and major dysfunction of a joint.  *Id.*; 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 1.02, 1.04.  Although the ALJ determined that Claimant had

---

[3] The RFC is the most that a claimant can do despite the effects of her impairments.  20 C.F.R. § 404.1545(a).

degenerative disc disease, he found no evidence of a compromised nerve root or gross anatomical deformity.  R. 19.

The ALJ then proceeded to consider Claimant's RFC and concluded that Claimant is capable of performing sedentary work[4] with the option to sit or stand at will.  *Id.*  The ALJ determined that Claimant can frequently balance but occasionally stoop, crouch, kneel, reach overhead, and climb ramps and stairs.  *Id.*  After considering all of the evidence, the ALJ determined that although the medical evidence could reasonably be expected to cause Claimant's alleged symptoms, her statements regarding the intensity, persistence, and limiting effects of those symptoms were not credible to the extent that they were inconsistent with the RFC finding.  R. 20.  Instead, the ALJ gave significant weight to Dr. Hong's opinion that Claimant had the full capacity to sit, stand, or walk, and to Dr. Kim's opinion that Claimant could perform light work.[5]  R. 21–22.  The ALJ noted that there was no evidence to suggest Claimant's condition worsened over time but instead Claimant's treatment regimen remained consistent.  R. 21.  He questioned whether Claimant would have practiced yoga and attempted to start a business if her condition were as serious as she claimed.  *Id.*  Additionally, the ALJ reasoned that Claimant's failure to seek medical attention since August 2008 indicated that her symptoms were not as limiting as she claimed.  R. 22.

---

[4] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  20 C.F.R. § 404.1567(a).

[5] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  20 C.F.R. § 404.1567(b).

At step four, the ALJ concluded Claimant could perform her past relevant work as a claims auditor or claims examiner. R. 23. He relied on the VE's testimony, finding that a person with Claimant's RFC could perform the work both as Claimant performed it and as it is generally performed. *Id.* Therefore, the ALJ did not proceed to step five and concluded that Claimant was not disabled under the Social Security Act. *Id.*

## II.   LEGAL STANDARDS

### A.    Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commission's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* The reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it

cannot stand.  *Villano v.  Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision.  *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).  It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations."  *Elder v.  Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings.  *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

## B.      Disability Standard

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined by the Social Security Act.  *Liskowitz v. Astrue*, 559 F.3d 736, 739–40 (7th Cir. 2009).  "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2)(A).  Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i–v).  Under this process, the ALJ must inquire, in the following

order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven she cannot continue her past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

Claimant raises the following issues in support of her motion: (1) whether the ALJ properly weighed the medical evidence when finding that Claimant's depression was non-severe; (2) whether the ALJ adequately considered whether Claimant's combined impairments medically equal a listed impairment; (3) whether the ALJ properly determined Claimant's residual functional capacity; and (4) whether substantial evidence supports the ALJ's finding that the Claimant could perform her past relevant work.

### A. At Step Two, the ALJ Properly Weighed the Opinion of Claimant's Treating Psychiatrist.

At step two of the disability analysis, an ALJ must determine which of a claimant's impairments are medically severe. 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is one that significantly limits the claimant's mental or physical ability to do basic work activities. 20 C.F.R. § 404.1520(c). In making this finding, an ALJ must determine what weight to give the opinions of the claimant's treating physicians. 20 C.F.R. § 404.1527. A

treating physician's opinion is entitled to controlling weight if it is supported by the medical findings and not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). An ALJ must offer "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 404.1527(d)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). In other words, the ALJ must point to some "well-supported contradictory evidence" before discounting the opinion. *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006).

Here, the ALJ determined Claimant's severe impairments were fibromyalgia, degenerative disc disease of the lumbar spine, and hypothyroidism. R. 16. The ALJ found Claimant's depression to be non-severe because it "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." *Id.* To support this conclusion, the ALJ relied on the opinion of a state agency psychiatric examiner, Dr. Hollerauer, and the April 2007 psychiatric evaluation from Claimant's treating psychiatrist, Dr. Beck. R. 16–18. The ALJ rejected the conclusions in Dr. Beck's July 2007 report. R. 18.

As an initial matter, Claimant contends that the ALJ erred by giving only "some weight" to Dr. Beck's April 2007 evaluation in his conclusion and by omitting other portions of the same report that support Claimant's assertion that her depression is severe. Specifically, Claimant points to the portion of the evaluation which states that Claimant can perform work-related activities but needs an "extremely variable workload to compensate for her intermittent symptoms." R. 626. Claimant concludes that the ALJ failed to explain why

the need for an "extremely variable workload" would not constitute a significant limitation on Claimant's ability to perform work-related activities.

Despite Claimant's contentions, the ALJ's analysis adequately addressed Dr. Beck's April 2007 report. R. 16–18. In his detailed analysis of Claimant's mental functioning, the ALJ supported his conclusions with opinions from Dr. Hollerauer and Dr. Beck's April 2007 evaluation, as well as Claimant's disability reports, activities of daily living reports, and hearing testimony. *Id.* The ALJ not only analyzed the conclusions of Dr. Beck and Dr. Hollerauer, but also rated Claimant's degree of functional limitation in four areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation, citing to Dr. Beck's April 2007 report. R. 17. These are the four broad functional areas that SSA regulations identify as relevant to evaluating mental impairments. *See* 20 C.F.R. § 416.920a(c)(3). Each functional area was discussed separately in the decision. R. 17. The ALJ found Claimant had mild limitation in activities of daily living; mild limitation in social functioning; mild limitation in concentration, persistence, or pace; and no episodes of decompensation. *Id.* He therefore concluded that her depression fell short of "severe" under the applicable regulations. R. 18 (citing 20 C.F.R. 1520a(d)(1)).

This discussion provided adequate reasons for discounting some portions of Dr. Beck's April 2007 report. For instance, the ALJ compared Dr. Beck's findings with Claimant's disability report, activities of daily living report, and hearing testimony, which did not contain any allegations that her mental impairments caused any type of work-related limitations, but rather focused on the physical limitations her fibromyalgia caused. R. 16–17. The ALJ acknowledged Dr. Beck's findings that Claimant's activities of daily living fluctuate but noted that the report did not point out any specific functional limitations. R. 623. The report did not specify whether the stated fluctuations in daily activities were caused by mental impairments or physical conditions. *Id.* In fact, Dr. Beck's report noted Claimant was interested in business; that her depression had no affect on her personal relationships; and that although she had a dysphoric mood, she had no alteration in speech or thought process. *Id.* The report also stated that Claimant did not exhibit any defects in memory, ability to perform calculation, abstract thinking, orientation, or judgment. *Id.* The ALJ therefore adopted Dr. Hollerauer's conclusion that Claimant's depression was non-severe and secondary to Claimant's fibromyalgia. R. 16–18.

As for Dr. Beck's July 2007 report, the ALJ provided ample reasons for disregarding it. Foremost was the report's unexplained inconsistency with Dr. Beck's other evaluation from only three months before. Whereas the April 2007 report highlighted no specific mental limitations aside from a dysphoric mood, the July 2007 report described Claimant's ability as "fair" or "poor/none" in fourteen of sixteen mental abilities needed for unskilled work. This later report concluded that Claimant was moderately limited in activities of daily living

and social functioning; experienced frequent deficiencies in concentration, persistence and pace; and had experienced repeated episodes of decompensation. R. 644. The ALJ also correctly noted Dr. Beck's conclusions were "generally vague and imprecise" and lacked explanations or objective grounding. R. 18. The Seventh Circuit has noted that check-box questionnaires are weak evidence unless corroborated by other medical records. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (*citing Mason v. Shalala*, 944 F.2s 1059, 1065 (3rd Cir. 1993)). Here, Dr. Beck's July 2007 evaluation was a mental impairment questionnaire form consisting mostly of check boxes, and the record contains no treatment notes or other records from Dr. Beck's treatment of Claimant. R. 641–644. Dr. Beck failed to fill out portions of the questionnaire that requested explanations or to attach any relevant treatment notes or tests results that supported his conclusions. R. 644. Nor do the other medical records in the case support Dr. Beck's findings. For instance, Dr. Beck reported that Claimant had experienced repeated episodes of decompensation, but the record contains no evidence that Claimant has been hospitalized for depression or has otherwise experienced exacerbation of her mental symptoms. R. 17. The ALJ thoroughly analyzed Dr. Beck's reports.

**B.    Unless the ALJ Concludes that Claimant's Depression is Severe, He Need Not Consider Whether Claimant Medically Equals a Listed Mental Impairment.**

At step three of the disability analysis, an ALJ must determine whether a claimant's impairment meets or medically equals a listed impairment. 20 C.F.R. § 404.1520(d). In making this determination, an ALJ is required to consider the aggregate effects of claimant's impairments, including those that are not severe. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir.

2008).  The ALJ has a duty to consult a medical expert on the issue of medical equivalency, but this duty is generally satisfied by obtaining the opinion of a consulting agency physician.  *See Scheck v. Barnhart*, 357 F.3d 697, 700–01 (7th Cir. 2004).  An ALJ need not specifically articulate why a claimant falls short of a particular listing unless the claimant has presented substantial evidence that she meets or equals the listing.  *Id.*

Here, the ALJ need not consider whether Claimant medically equals a listed mental disorder unless he concludes at step two that she has a severe mental impairment.  Claimant makes much of the ALJ's succinct step-three analysis but provides scant explanation of how Claimant equals a specific listing.  In fact, Claimant's initial brief failed to identify any specific listing the ALJ should have considered more fully.  Her reply brief does name Listing 12.04, the listing for affective disorders.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.  But of course the ALJ did not consider whether Claimant's impairments equalled Listing 12.04, having determined at step two of the sequential analysis that Claimant's mental impairment was not even severe.  Unless the ALJ concludes on remand that Claimant has a severe mental impairment, he need not reconsider his step-three finding.

C.     **The ALJ Should Revisit the RFC and Credibility Finding on Remand Because the ALJ Failed to Incorporate Certain Impairments and Failed to Discuss Claimant's Ability to Pay for Medical Treatment.**

Before proceeding to step four of the disability analysis, the ALJ must determine a claimant's RFC by weighing all of the relevant evidence in the case record.  20 C.F.R. § 404.1545(a); *see also* SSR 96-8p, 1996 WL 374184.  While medical opinions may be a strong indicator of a claimant's RFC, "the final responsibility for deciding [this issue] is

reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(2). Claimant argues that the ALJ in this case made an erroneous RFC finding by: (1) failing to incorporate proper restrictions about Claimant's mental impairments and ability to balance; (2) improperly assessing Claimant's credibility; and (3) inconsistently conceding that Claimant could not sustain work on a full-time schedule.

### 1. On Remand, The ALJ Should Incorporate Restrictions to Reflect Claimant's Mental Impairments and Ability to Balance.

Claimant argues that the ALJ erred by failing to consider the symptoms of her depression when formulating the RFC finding. When determining a claimant's RFC, the ALJ must consider the combined effect of all impairments, "even those that would not be considered severe in isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing 20 C.F.R. § 404.1523). An ALJ's "failure to fully consider the impact of non-severe impairments requires reversal." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003)).

Here, the ALJ did not adequately consider the impact of Claimant's non-severe depression in determining Claimant's RFC. The ALJ found that Claimant's depression caused mild limitation in her activities of daily living; mild limitation in social functioning; and mild limitation in concentration, persistence, or pace. R. 17. These three limitations should have been reflected as limitations in the RFC finding.

At the end of his step-two analysis, the ALJ did state that "the following residual functional capacity assessment reflects the degree of limitation the undersigned has found" in the mental functioning analysis. R. 18. But this was not enough, because the combined impact of the impairments must be "considered throughout the disability determination process." 20 C.F.R. § 404.1523; *see also Koswenda v. Astrue*, 08 C 4732, 2009 WL 958542, at *5 (N.D. Ill. Apr. 2, 2009) (remanding because ALJ failed to incorporate in hypothetical to VE a claimant's mild limitation in concentration, persistence, or pace).

Because the ALJ did not include any mental functioning restrictions in his RFC finding, Claimant's mental functioning limitations could not be taken into account in the step-four finding. As a result, the ALJ never considered whether Claimant's mental impairments affected her ability to perform her past relevant work, which was skilled in nature. R. 23. This error necessitates a remand. *See Denton*, 596 F.3d at 423.

In addition, the ALJ erred in finding that Claimant could engage in frequent balancing. R. 19. He relied on Dr. Kim's opinion as to Claimant's limitations, but Dr. Kim concluded Claimant could only balance occasionally. R. 650. The ALJ cited no evidence to support a finding that Claimant can engage in frequent balancing. Absent any other errors, this error may have been harmless, if it turns out that Claimant's past work only required occasional balancing. In any event, the ALJ should reconsider his "frequent balancing" finding on remand.

## 2.     The ALJ Should Revisit His Credibility Finding on Remand.

An ALJ's credibility determinations deserve special deference, because only the ALJ observes the claimant testify.  *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).  Rather than nitpicking for inconsistencies or contradictions, courts are to give a common sense reading to an ALJ's opinion and to reverse credibility determinations "only if they are patently wrong."  *Id.*  Applicants for disability benefits have an incentive to exaggerate their symptoms, so an ALJ may discount an applicant's testimony based on other evidence in the case.  *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2000).

In light of the remand here, the Court need not determine whether the ALJ's credibility finding was patently wrong, but his analysis does contain one flaw worth flagging now. Infrequent treatment can support an adverse credibility finding if a claimant has no good explanation for the lack of treatment.  SSR 96-7p, 1996 WL 374186, at *7.  Even so, the ALJ "must not draw any inferences" from the infrequent treatment until he has explored the claimant's explanation for it.  *Id.*  Where the record contains evidence that a claimant could not afford treatment, the ALJ must explore the claimant's ability to pay before relying on the lack of treatment to support an adverse credibility finding.  *See Craft v. Astrue*, 539 F.3d 668, 678–79 (7th Cir. 2008).

Here, the ALJ discounted Claimant's credibility because the record lacked treatment records after 2007, and Claimant had not seen a physician or been to the emergency room since 2008.  R. 22.  But the ALJ failed to acknowledge Claimant's repeated testimony that she no longer had health insurance and could no longer afford treatment.  R. 44–46, 48.  Claimant

explained that she paid about $600 per month for COBRA benefits after quitting her job but could not afford insurance once her husband lost his job. R. 45. The ALJ erred by drawing negative inferences from the lack of treatment without first addressing Claimant's ability to pay. *See Craft*, 539 F.3d at 678–79.

The ability to pay issue is especially significant here, because Claimant did pursue medical treatment while she held a job with health insurance benefits and only stopped when she lost her insurance. Exploring the issue might lead the ALJ to question why, if she was still capable of performing the work, Claimant would walk away from a $50,000+ a year job with benefits that she depended on for her medical treatment. On remand, the ALJ should revisit his credibility finding to consider whether it is affected by the ability to pay issue or any new findings made in further proceedings.

### 3. The ALJ Never Found that Claimant Lacked the Ability to Sustain Full-Time Work.

Claimant also purports to identify a "glaring error" in the ALJ's RFC conclusion, but this argument is nothing more than a misreading of the ALJ's decision. In summing up his RFC finding, the ALJ concluded,

> Based on the foregoing analysis, the undersigned finds that while the claimant's impairments do impact her ability to perform basic work activities on a regular and continuing basis, they do not preclude the performance of work altogether. His assessment of the claimant's residual functional capacity adequately accounts for all of her symptoms.

R. 22. Claimant argues that this statement was tantamount to a finding that Claimant could not sustain full-time work. She emphasizes that "regular and continuing basis" is a term of

art meaning eight hours per day, for five days per week, or an equivalent work schedule. *See* SSR 96-8p, 1996 WL 374184, at *1. A finding that Claimant cannot sustain full-time work would require a conclusion that she is disabled. Claimant's interpretation, however, divorces the ALJ's "regular and continuing basis" statement from its context. A fair reading of the ALJ's statement is that Claimant's impairments impact but do not wholly eliminate her ability to perform basic work activities. Thus, the ALJ imposed restrictions in his RFC finding to account for the impairments. This reading is consistent with the rest of the ALJ's decision, which contains no hint that the ALJ intended to find that Claimant cannot sustain full-time work.

**D.     On Remand, The ALJ Should Apply the Revised RFC Finding When Determining Whether Claimant Can Perform Her Past Relevant Work.**

Normally, an ALJ's hypothetical to the VE must "include all limitations supported by medical evidence in the record." *See Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir. 2009) (citation omitted). Here, the parties do not dispute that the ALJ's step-four finding relied on hypotheticals that reflected the RFC finding. Because the RFC finding was flawed, the ALJ's finding that Claimant could perform past relevant work must also be reconsidered in light of any new findings on remand.

## IV. CONCLUSION

For the reasons set forth in this opinion, the Court grants Claimant's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands the case to the Commissioner for further proceedings consistent with this opinion.

**SO ORDERED THIS 24th DAY OF MAY, 2011.**

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

Copies sent to:

| | |
|---|---|
| Barry Alan Schultz | Carole J. Kohn |
| Law Offices of Barry Schultz | Assistant Regional Counsel |
| 1601 Sherman Avenue | Social Security Administration |
| Suite 510 | 200 West Adams Street, Suite 3000 |
| Evanston, IL 60201 | Chicago, Illinois 60606 |
| | |
| Counsel for Plaintiff | James Michael Kuhn |
| | United States Attorney's Office (NDIL) |
| | 219 South Dearborn Street |
| | Suite 500 |
| | Chicago, IL 60604 |
| | |
| | Counsel for Defendant |